**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                 :
CHARLES SCHELLENBERGER,          :    CIVIL ACTION NO. 10-2398 (MLC)
                                 :
        Plaintiff,               :    MEMORANDUM OPINION
                                 :
        v.                       :
                                 :
BJ'S WHOLESALE CLUB, INC.,       :
                                 :
        Defendant.               :
_____ :
```

**COOPER, District Judge**

Plaintiff, Charles Schellenberger, proceeding pro se, commenced this action in New Jersey Superior Court, Mercer County, against Defendant, BJ's Wholesale Club, Inc. ("BJ's"), alleging wrongful termination, disability discrimination, hostile work environment, and failure to accommodate.  (Dkt. entry no. 1, Rmv. Not., Ex. A, Compl.)  BJ's removed the action on the basis that subject matter exists pursuant to 28 U.S.C. § 1332.  (Rmv. Not.)  BJ's moves for summary judgment in its favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry no. 34.)  Plaintiff opposes the motion.  (Dkt. entry no. 38, Pl. Opp'n.)

The Court decides the motion on the papers without oral argument, pursuant to Local Civil Rule 78.1(b).  The Court, for the reasons stated herein, will grant the motion.

**BACKGROUND**

**I.    Plaintiff's Employment at BJ's**

Plaintiff was employed by BJ's from 1994 until his termination in May 2009.  (Pl. Opp'n at 2; dkt. entry no. 34, Raghib Cert. at ¶ 21; dkt. entry no. 34, Minton Cert., Ex. I, Pl. Job Summary.)  In March 2005, Plaintiff was selected for inclusion in the General Manager in Training ("GMIT") program, which prepares senior management employees for promotion to general management.  (See Minton Cert., Ex. M, Bench Candidate Input Form; dkt. entry no. 34, Def. Stmt. Facts at ¶ 9.) Plaintiff was transferred from New Jersey to Virginia in January 2006 as part of his participation in the GMIT program.  (Id. at ¶ 11.)

Less than six months later, Plaintiff requested to be transferred back to New Jersey, a decision that was viewed unfavorably by BJ's in light of the considerable expense it had spent to relocate him.  (Id. at ¶¶ 14, 18.)  Sometime around November 2007, Plaintiff was advised that he had been removed from the GMIT program "because he reneged on his agreement to relocate."  (Raghib Cert. at ¶ 4; see also dkt. entry no. 34, Anders Cert., Ex. B, Pl. Dep. at 109:8-110:4.)  However, he continued working at BJ's Hamilton, New Jersey store as a senior merchandising manager.  (Dkt. entry no. 34, Breslin Cert. at ¶ 4; Pl. Dep. at 112:4-113:13 (indicating that he alternatively served

2

as "merchandise manager" and "operations manager" at the Hamilton store after his return from Virginia).)

## II.  Plaintiff's Ankle Condition and Related Leaves of Absence

Plaintiff had surgery on his left ankle in 2004.  (Pl. Dep. at 165:13-19.)  Plaintiff's ankle problems dated back to 2001 or 2002, when he hurt it stepping off a forklift.  (Pl. Dep. at 165:20-25, 166:4-8.)  He took a leave of absence of several months to recover from the ankle surgery, but did not experience any problems returning to his employment in 2004.  (Pl. Dep. at 167:7-168:17.)  Plaintiff states that the surgery fused the ankle joint, which causes him to walk with a distinct limp.  (Pl. Opp'n at 8.)

Plaintiff had to take another leave of absence from his employment in September 2006, shortly after he was transferred back to New Jersey, in order to have a second surgery on his left ankle.  (Pl. Dep. at 169:4-10; Def. Stmt. Facts at ¶ 44.)  He returned to his position following a six-month medical leave of absence, and stated at his deposition that he did not feel he was discriminated against in connection with that leave of absence.  (Pl. Dep. at 169:11-20; Def. Stmt. Facts at ¶ 46.)

Plaintiff took what would ultimately be his final leave of absence in November 2008.  (Pl. Dep. at 171:16-18.)  On or about November 4, 2008, Plaintiff submitted a leave of absence request because he was again having issues with his ankle.  (Pl. Dep. at

173:12-174:9.)  Plaintiff's physician provided separate notes in support of the leave of absence request indicating, respectively, that Plaintiff would be incapacitated from (1) November 3, 2008 to November 24, 2008, and (2) November 13, 2008, to December 19, 2008.  (Pl. Dep. at 173:23-174:22; Anders Cert., Ex. J, 11-3-08 Disability Cert. from Dr. Reda; id., Ex. K, 11-3-08 Disability Cert. from Dr. Reda.)  Plaintiff provided BJ's another note from his physician on November 24, 2008, stating that he would be incapacitated from that date through December 11, 2008.  (Pl. Dep. at 182:5-12; Anders Cert., Ex. L, 11-24-08 Disability Cert. from Dr. Reda.)  Plaintiff found out on December 19, 2008, that his ankle required another major surgery, and he informed his General Manager, Robert Stenborg, of the developments in treatment each time he spoke with a doctor.  (Pl. Dep. at 179:24-181:5.)  On that date, Plaintiff submitted to Stenborg a physician's note stating that he would be incapacitated from December 19, 2008, "to present," which Plaintiff stated he understood to mean the physician "didn't know exactly what the time frame was going to be."  (Pl. Dep. at 186:22-187:22; Anders Cert., Ex. M, 12-19-08 Disability Cert. from Dr. Ahmed.)

Plaintiff's ankle surgery was scheduled for January 2, 2009.  (Pl. Dep. at 188:1-5.)  Plaintiff's physician provided a note on December 29, 2008, stating that Plaintiff would be incapacitated until April 15, 2009.  (Pl. Dep. at 190:20-191:2; Anders Cert.,

4

Ex. N, 12-29-09 Note from Dr. Ahmed.)[1]  Plaintiff, having updated
Stenborg on these developments, considered Stenborg to have
approved these extensions to his leave of absence.  (Pl. Dep. at
192:12-24.)  Plaintiff did not return to work on April 15, 2009,
and advised Stenborg that he would not be able to return to work
on that date.  (Pl. Dep. at 195:13-197:8.)  A note from Dr. Ahmed
dated April 28, 2009, and stamped "Received" by BJ's Benefits
department on May 6, 2009, states that Plaintiff would be totally
incapacitated from April 29, 2009, until May 4, 2009, and would
be able to return to work after May 4, 2009.  (Anders Cert., Ex.
P, 4-28-09 Disability Cert. from Dr. Ahmed.)  It is unclear from
the record before the Court when, precisely, Plaintiff advised
BJ's that he wished to return to work.

**III. Disciplinary Actions Taken Against Plaintiff**

Certain disciplinary actions had been taken against
Plaintiff in the months preceding his final medical leave of
absence commencing in November 2008, which the Court summarizes
here.  Pursuant to the BJ's Club Team Member Guide in effect

---

[1] Another note from the same physician received by BJ's on the
same date indicated that Plaintiff would need to be on medical
leave from December 29, 2008, for an "undetermined" amount of
time.  (Pl. Dep. at 193:24-194:15; Anders Cert., Ex. O, Cert. of
Health Care Provider (signed by Dr. Ahmed on 12-1-08 and stamped
"received" on December 29, 2008).)  Plaintiff stated at his
deposition that he did not know why his physician would have put
an expected return date in April 2009 on one note and
"undetermined" on the other, both of which were sent to BJ's.
(Pl. Dep. at 194:20-23.)

during Plaintiff's employment, employees in field management or general manager positions must wear "business casual" attire, which expressly excludes sneakers and shorts.  (Minton Cert., Ex. A, BJ's Club Team Member Guide at 18; Breslin Cert. at ¶ 11; Def. Stmt. Facts at ¶ 25.)  Plaintiff was issued a written warning on August 25, 2008, for wearing gym shorts during his shift on August 14 and 22, 2008.  (Minton Cert., Ex. K, 8-25-08 Written Warning.)  The August 25, 2008 written warning also states that Plaintiff had been late to work on August 4, 5, 13, and 19. (Id.)  The author of the written warning, Plaintiff's General Manager, Stenborg, advised that (1) it was insubordinate for Plaintiff to wear gym shorts on August 22, 2008, in light of Stenborg having orally reminded him on August 20, 2008, that wearing shorts was inappropriate; and (2) as a senior manager, Plaintiff must set an example for others by adhering to the dress policy and coming to work on time.  (Id.)  Plaintiff refused to sign the August 25, 2008 written warning.  (Id.)[2]  Plaintiff disputes that the August 20, 2008 oral warning happened at all. (Pl. Dep. at 125:12-19.)

_____

[2] Plaintiff's unsworn opposition brief states that (1) Stenborg had at some point agreed to allow Plaintiff to come in at 12 A.M. instead of 10 P.M. when he was scheduled to work overnight on nights that his wife, a BJ's employee at a different store, was also scheduled to work; and (2) it was "general practice" for overnight managers to wear shorts and short pants.  (Pl. Opp'n at 3.)

Stenborg issued a second written warning to Plaintiff on September 26, 2008.  (Minton Cert., Ex. L, 9-26-08 Written Warning.)  The September 26, 2008 written warning states that Plaintiff had been "two hours late three times in the past week," without providing advance notice to Stenborg.  (Id.)  Stenborg advised that future instances of unexcused tardiness would "lead to further disciplinary action up to and including termination." (Id.)  As with the first warning, Plaintiff refused to sign the second warning.  (Id.)

A final written warning was issued to Plaintiff on October 28, 2008.  (Minton Cert., Ex. E, 10-28-08 Written Warning.)  This warning was issued in response to Plaintiff's calling out sick from work on October 21 and 23, 2008, despite not having any sick time available.  (Id.)  Stenborg noted that he had issued a written warning on November 17, 2007, in response to the same issue, and advised, "This is becoming a pattern and must cease immediately."  (Id.)  Plaintiff did sign the final written warning.  (Id.)

Plaintiff's annual performance review for 2008 was prepared in January 2009.  (Minton Cert., Ex. D, Pl. 2008 Performance Review; Def. Stmt. Facts at ¶ 34.)  He received a review rating of "Needs Improvement."  (Pl. 2008 Performance Review.)  The performance appraisal comments note that Plaintiff "is on a Final Warning for attendance and must improve on this area

7

immediately." (Id.)  Under "Personal Development," the review
states that Plaintiff "must comply with the company Appearance
Policy." (Id.)  The 2008 Performance Review was apparently never
given to Plaintiff, because he was on a leave of absence in April
2009, when the review process concluded, and had been on leave
since early November 2008.  (Def. Stmt. Facts at ¶¶ 36-38.)

**IV.  Plaintiff's Termination**

BJ's filled Plaintiff's position sometime in March 2009,
while Plaintiff was still on a leave of absence.  (Id. at ¶ 60;
Raghib Cert. at ¶ 17 (stating that Plaintiff had been on a leave
of absence for over four months, with no expected return to work
date, and keeping the position open was placing an undue hardship
on BJ's).)  Plaintiff advised BJ's in April 2009 that he wished
to return to work.  (Raghib Cert. at ¶ 18.)  At this time, there
were no open management positions available in the Hamilton, New
Jersey store, and Plaintiff's former position had been filled.
(Id. at ¶ 19.)  Company policy dictated that employees are
eligible to bid for an open position within the company if they
are (1) not in the written warning stage of BJ's progressive
discipline process, and (2) received at least a "Very Good" or
"Outstanding" on their last performance appraisal.  (Minton Cert.
at ¶¶ 3-4 & Ex. C, BJ's 1995 Job Posting Policy at 2; Breslin
Cert. at ¶ 13.)

BJ's management, including the Regional Director, determined that Plaintiff was ineligible to transfer to a different position under company policy because he was both in the written warning state of the progressive discipline process, and had received a "Needs Improvement" rating on his 2008 Performance Review. (Raghib Cert. at ¶ 20; Minton Cert. at ¶ 8.)  Because there were no open positions available at the Hamilton store and Plaintiff was ineligible to transfer to a different store, Plaintiff's employment at BJ's was terminated on May 11, 2009.  (Raghib Cert. at ¶ 21; Minton Cert. at ¶ 9; Breslin Cert. at ¶ 15.)  Plaintiff was informed of the termination decision during a meeting held on that date, which Plaintiff recorded.  (Def. Stmt. Facts at ¶¶ 66-67; Anders Cert., Ex. I, 5-11-09 Meeting Tr.)  At that meeting, Stenborg stated to Plaintiff, "[T]here is no management position to return to.  So we have to terminate your employment."  (5-11-09 Meeting Tr. at 4:9-12.)

## V.   Plaintiff's Applications for Disability Benefits

Prior to his termination, while he was on a medical leave of absence, Plaintiff applied for long-term disability benefits. (Minton Cert., Ex. B, Long Term Disability Benefits Application – Employee's Statement dated 1-29-09.)  In that application, Plaintiff certified that his disability began on the date he last worked, November 4, 2008.  (Id. at 1.)

9

Plaintiff testified at his deposition that after his termination from BJ's, he did not seek employment because of his "physical condition at the time," despite having a note from his physician clearing him to return to work. (Pl. Dep. at 213:7-25.)

Plaintiff submitted an application for Social Security disability benefits on June 30, 2009. (Anders Cert., Ex. E, App. for Disability Benefits.) In his application for disability benefits, Plaintiff stated that he became unable to work on November 4, 2008, and as of the date of the application, June 30, 2009, was still disabled. (<u>Id.</u> at 1.) Plaintiff stated in a response to an interrogatory that he was awarded disability payments of $1,752.00 per month beginning in August 2009, and also that he has not made any efforts to obtain employment since his termination from BJ's. (Anders Cert., Ex. F, Pl. Answers to Def. First Set of Interrog. at 7, 9.)

**VI. Plaintiff's Claims**

Plaintiff believes he was wrongfully terminated because he "was terminated while [he] was out on disability, on an approved leave of absence." (Pl. Dep. at 202:5-8.) According to Plaintiff, he was entitled under the employee handbook to a six-month medical leave, yet his employment was terminated less than six months after he went on leave for his ankle injury. (Pl. Dep. at 202:11-203:14; Pl. Opp'n at 5.)

10

Plaintiff also asserts that he was discriminated against on the basis of his disability, because he was (1) terminated while out on disability; (2) subjected to what he felt were unfair disciplinary actions following his 2007 leave of absence; and (3) removed from the GMIT program during his 2006 leave of absence. (Pl. Dep. at 205:19-210:6.)  BJ's argues that Plaintiff cannot make out a prima facie case of discrimination, but in any event, it had legitimate nondiscriminatory reasons for terminating him. (Dkt. entry no. 34, Def. Br. at 7-9, 13, 16.)

Plaintiff's hostile work environment claim is also based on the disciplinary actions taken against him, as well as what he perceived as unfair scheduling practices vis-a-vis other employees.  (Pl. Dep. at 210:15-25; Pl. Opp'n at 6.)  BJ's argues that there is nothing in the record to support an inference that the disciplinary actions were taken for discriminatory reasons, and the conduct alleged does not rise to the level of hostile and abusive employment conditions.  (Def. Br. at 22-25.)

Plaintiff's failure to accommodate claim is based on his allegation that in 2006 and 2007 he requested permission to wear sneakers due to his ankle problems, and brought in a request from his doctor that he be permitted to wear the same while at work, but was denied permission on the basis that sneakers did not fall within the requirements of the dress code.  (Pl. Dep. at 211:11-

213:3; Pl. Opp'n at 8.)  BJ's submits that this claim is time-barred.  (Def. Br. at 26-27.)

## DISCUSSION

### I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

### II.  New Jersey Law Against Discrimination

We consider Plaintiff's claims to arise under the New Jersey Law Against Discrimination ("NJLAD").  (See generally Compl.)[3] The NJLAD is remedial social legislation that is to be liberally construed.  Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 495 (1982).  It provides in relevant part:

---

[3] We observe that courts frequently consider analogous federal precedent in construing the NJLAD.  See Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993).

> It shall be an unlawful employment practice . . . for
> an employer, because of the . . . disability . . . of
> any individual, . . . to refuse to hire or employ or to
> bar or to discharge or require to retire, unless
> justified by lawful considerations other than age, from
> employment such individual or to discriminate against
> such individual in compensation or in terms, conditions
> or privileges of employment. . . .

N.J.S.A. § 10:5-12(a).  The law prohibits discrimination against

a person who "is or has been any time disabled . . . unless the

nature and extent of the disability reasonably precludes the

performance of the particular employment."  N.J.S.A. § 10:5-4.1.

The NJLAD defines "disability" to include "any physical

disability, infirmity, malformation or disfigurement which is

caused by bodily injury . . . and which shall include, but not be

limited to, any degree of paralysis, amputation, [or] lack of

physical coordination. . . ."  N.J.S.A. § 10:5-5(q).  "[A]lthough

it prohibits discriminatory employment practices, [the NJLAD]

acknowledges the right of employers to manage their businesses as

they see fit."  Viscik v. Fowler Equip. Co., 173 N.J. 1, 13

(2002); see also Andersen, 89 N.J. at 496 (observing that the

NJLAD allows an employer "to reject those applicants who are

unable to do the job, whether because they are generally

unqualified or because they have a handicap that in fact impedes

job performance").

### III. Analysis of Plaintiff's Claims

####    A.    Discriminatory Discharge Claim

Plaintiff's "wrongful termination" and "disability discrimination" claims, though pleaded separately, constitute a single claim for discriminatory discharge.  (Def. Br. at 5-6; Pl. Dep. at 204:12-19.)  To establish a claim for discriminatory discharge under the NJLAD, a plaintiff must first show that (1) he was disabled within the meaning of the law, (2) he was meeting the employer's legitimate performance expectations, (3) he was terminated, and (4) the employer sought someone to perform the same work after he left.  Jansen v. Food Circus Supermkts., Inc., 110 N.J. 363, 382 (1988); Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597 (1988); see also Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 249 (3d Cir. 2006).  Once the plaintiff makes this prima facie showing, a presumption of discrimination arises, and "the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  Viscik, 173 N.J. at 14.

The burden of production then shifts back to the plaintiff to show that the employer's proffered reason was a mere pretext for discrimination.  Id.; see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  To defeat summary judgment in favor of the employer where the employer has come forth with legitimate, non-discriminatory reasons for the

14

employment action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." LaResca v. Am. Tel. & Tel., 161 F.Supp.2d 323, 335-36 (D.N.J. 2001); cf. Viscik, 173 N.J. at 14 ("To prove pretext . . . a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent.")  In other words, an employee's firing may be unfair, but not illegal. Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 561 (1990).  The burden of proving discrimination remains with the employee at all times. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450-51 (2005).

We find the second element of the prima facie case dispositive here.  A plaintiff cannot make out a prima facie case for discriminatory discharge if he is unable to show that he was actually performing or able to perform his job. See Winters v. Sharp Elec. Corp., No. A-6105-05T5, 2008 WL 680732, at *6-7 (N.J. App. Div. Mar. 14, 2008).  Plaintiff's applications for long-term and Social Security disability benefits, in which he certified that he had been disabled and continually unable to work since November 4, 2008, constrain Plaintiff from arguing that he was

actually performing his job at the time of his termination in May 2009.  Id. at *7-8 & n.8.  This position is inconsistent with any assertion that Plaintiff was able to perform his job as of the date of his termination, and the evidence before the Court indicates that: (1) Plaintiff was unable to return to work on or before April 15, 2009; (2)  Plaintiff's physician informed BJ's that Plaintiff was totally incapacitated from April 28, 2009, through May 4, 2009; and (3) Plaintiff never sought employment after his termination on May 11, 2009, because his physical condition did not permit it.

Absent any express representation by either party as to the date on which Plaintiff approached BJ's about returning to work, the Court infers that Plaintiff must have done so sometime between April 16, 2009, and April 27, 2009, inclusive.  Because Plaintiff has offered neither an explanation as to the apparent discrepancy between his claim of discrimination and his claims for disability benefits, nor any evidence that he was able to perform his job with a reasonable accommodation at the time of his termination, his claim for discriminatory discharge cannot prevail.  See Marino v. Adamar of Jersey, Inc., No. 05-4528, 2009 WL 260799, at *4-6 (D.N.J. Feb. 4, 2009).[4]

---

[4] Whether Plaintiff was actually performing or capable of performing his job did not come up at the time of his termination.  It was unnecessary for management to consider this question in light of its determination that there were no open positions for Plaintiff at the Hamilton store, and he was ineligible for transfer to a different store per BJ's policy.

Plaintiff argues that his termination was wrongful because the employee handbook provides that up to six months of medical leave may be granted, and when he attempted to return to work in April 2009, less than six months had elapsed since his leave began on November 4, 2008.  (Pl. Opp'n at 5.)  This argument is unavailing in light of the evidence showing that Plaintiff was not able to perform his job at the time he attempted to return. Additionally, the provisions relied upon by Plaintiff do not guarantee that an employee may return to work from a medical leave of less than six months; rather, they state that BJ's "will make every effort" to return an employee who has been on medical leave for longer than 12 weeks to the same or an equivalent position "where practical."  (Pl. Opp'n, Ex. 2.)

**B.   Hostile Work Environment Claim**

To assert a prima facie case of hostile work environment, plaintiff must show that (1) he is in a protected class; (2) he was subjected to conduct that would not have occurred but for that protected status; and (3) the hostile work environment was severe or pervasive enough to alter the conditions of employment. Lehmann, 132 N.J. at 603-04.  In this instance, to show that he is a member of a protected class, Plaintiff must show that he has a disability as defined in the NJLAD.  See N.J.S.A. § 10:5-5(q) ("'Disability' means physical disability, infirmity, malformation or disfigurement which is caused by bodily injury . . . and which

17

shall include, but not be limited to, any degree of paralysis, amputation, [or] lack of physical coordination. . . .").  That Plaintiff has a physical disability is not in dispute.  However, we find that Plaintiff has failed to establish the second and third elements of a hostile work environment claim.

Plaintiff bases his hostile work environment claim on (1) the disciplinary actions taken against him in 2008, and (2) his work schedule.  (See Def. Br. at 24.)  Neither argument can support such a claim, as there is no evidence that Plaintiff's disability had anything to do with the reasons for the corrective actions taken against him, e.g., wearing shorts to work in contravention of the dress code and being late for shifts, or his work schedule, which apparently involved generic parenting scheduling conflicts with his wife, who is also a BJ's employee, and his desire to either go back to school or work another job. (Pl. Dep. at 155:5-156:19.)  See Buffa v. N.J. State Dep't of Judiciary, 56 Fed.Appx. 571, 575-76 (3d Cir. 2003) (affirming grant of summary judgment in favor of employer on hostile work environment claim, where employer's relationship with supervisor was "poor," but plaintiff's claims that supervisor (1) questioned her requests to work a modified schedule and take time off, and (2) reprimanded her for violating the dress code, "failed to assert facts that would allow a reasonable jury to find that [the supervisor] harassed her because of her disability").  We also

18

find that Plaintiff's allegations do not establish the third requisite element, that the alleged hostile work environment was so severe or pervasive as to alter the conditions of employment. See id.; see also Swingle v. Novo Nordisk, Inc., No. 08-1186, 2009 WL 2778106, at *7 (D.N.J. Aug. 27, 2009).

Another basis for entry of judgment in favor of BJ's on this claim exists.  The second element requires Plaintiff to show, as with his discriminatory discharge claim, that he either was qualified to perform, or was actually performing, the essential functions of the job, with or without a reasonable accommodation. Raspa v. Office of Sheriff, 191 N.J. 323, 336 (2007).  As discussed above, Plaintiff has not shown that he was either qualified to perform or actually performing the essential functions of his job.  See supra at pp. 15-16.  Rather, the evidence indicates that Plaintiff's disability was so severe that he was unable to work from November 4, 2008, through the present.

## C.   **Failure to Accommodate Claim**

A claim for failure to accommodate under the NJLAD requires that the plaintiff establish both that he was disabled within the meaning of the statute, and sought a reasonable accommodation that would to allow him to perform the essential functions of the position.  See Victor v. State, 203 N.J. 383, 422-24 (2010).  We observe that Plaintiff has not adduced any documentary evidence supporting his assertion that he sought a reasonable

accommodation, namely, his request that he be allowed to wear sneakers to work.  (See Pl. Opp'n at 8.)  We find, however, that judgment should be entered in favor of BJ's on this claim on statute of limitations grounds.

The statute of limitations for claims brought pursuant to the NJLAD is two years.  Montells v. Haynes, 133 N.J. 282, 293-94 (1993).  Plaintiff testified at his deposition that he did not request any accommodations after 2007.  (Pl. Dep. at 211:11-212:15.)  A cause of action for failure to accommodate under the NJLAD accrues when a request for accommodation is made and denied.  See Wunder v. Katherine Gibbs Sch., No. 09-3497, 2010 WL 2680257, at *5 & n.9 (D.N.J. July 1, 2010).  Because Plaintiff did not file his Complaint until April 13, 2010, his failure to accommodate claim is barred by the two-year statute of limitations.  See Diaz v. Lezanski, No. 09-223, 2011 WL 2115671, at *8-9 (D.N.J. May 25, 2011); Durham v. Atl. City Elec. Co., No. 08-1120, 2010 WL 3906673, at *9 (D.N.J. Sept. 28, 2010).  Accordingly, judgment will be entered in favor of BJ's on this claim.[5]

---

[5] To the extent Plaintiff relies on his removal from the GMIT program as a basis for any of his claims, such claim would also be barred by the statute of limitations, insofar as Plaintiff was advised sometime in November 2007 that he had been so removed. See supra at p. 2.  (See also Def. Br. at 20-21.)

**CONCLUSION**

For the reasons stated _supra_, the Court will grant the motion.  The Court will issue an appropriate Order and Judgment.


                                        s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge


Dated:   November 4, 2011

21